[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-12540

_____

LOUIS MATTHEW CLEMENTS,

Petitioner-Appellant,

*versus*

STATE OF FLORIDA,
FLORIDA ATTORNEY GENERAL,
SECRETARY, DOC,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 2:17-cv-00396-JLB-NPM

_____

Before JORDAN, ROSENBAUM, and NEWSOM, Circuit Judges.

JORDAN, Circuit Judge:

When Congress first gave federal courts the authority to is-
sue writs of habeas corpus, it limited relief to persons held by fed-
eral authorities.  *See* Judiciary Act of 1789, § 14, 1 Stat. 81, 81-82; *Ex
Parte Dorr*, 44 U.S. 103, 105 (1845).  Congress generally extended
habeas corpus relief to state prisoners after the Civil War and did
so by making the writ available to "any person" who "may be re-
strained of his or her liberty" in violation of the laws of the United
States.  *See* Habeas Corpus Act of 1867, ch. 28, § 1, 14 Stat. 385,
385-86; *Dep't. of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959,
1976 (2020).  *See generally* Brandon L. Garrett & Lee Kovarsky,
Federal Habeas Corpus: Executive Detention and Post-Conviction
Litigation 100 (Foundation Press 2013) ("Passed alongside the Civil
War Amendments, the Habeas Corpus Act of 1867 permitted all
state prisoners to file habeas petitions in federal court.").

Since 1874, a person seeking federal habeas corpus relief
from a state court judgment must—among other things—be "in
custody."  *See Medberry v. Crosby*, 351 F.3d 1049, 1055 (11th Cir.
2003) (quoting former Rev. Stat. § 753).  The "in custody" require-
ment has remained unchanged through subsequent legislative re-
visions of the various habeas corpus statutes.  *See, e.g., Brown v.
Allen*, 344 U.S. 443, 462 n.17 (1953) (quoting the 1948 version of 28
U.S.C. § 2254); Act of Nov. 2, 1966, Pub. L. 89-711, § 2, 80 Stat. 1104,
1105 (placing "in custody" language in § 2254(a)).    The

Antiterrorism and Effective Death Penalty Act, passed by Congress in 1996, left intact the "in custody" language in § 2254(a). *See* Pub. L. 104-132, Title I, § 104, 110 Stat. 1214, 1217. *See also* Brian R. Means, Introduction to Habeas Corpus: A Primer on Federal Collateral Review 105-06 (2022) ("Nor did Congress when enacting the dramatic changes to federal postconviction review as part of the 1996 Antiterrorism and Effective Death Penalty Act affect the Supreme Court's custody jurisprudence.").

As relevant here, custody generally means physical detention or confinement. *See, e.g.,* 1 Shorter Oxford English Dictionary 584 (5th ed. 2002) ("Imprisonment."); The American Heritage Dictionary of the English Language 450 (4th ed. 2009) ("The state of being detained or held under guard, especially by the police."). Since the early 1960s, however, the Supreme Court has not interpreted the "in custody" requirement literally. As a result, certain restraints on a person's liberty, short of physical detention, can satisfy the "in custody" requirement. *See, e.g., Justices of Boston Mun. Ct. v. Lydon*, 466 U.S. 294, 301 (1984) (defendant released on his own recognizance pending retrial following vacatur of conviction was "in custody" under § 2254).

The question before us in this appeal—one of first impression—is whether Florida's registration and reporting requirements for sex offenders render those offenders "in custody" within the meaning of § 2254(a). Though the question is difficult given Supreme Court and Eleventh Circuit precedent, our answer is no.

## I

In 2008, Louis Clements pled guilty to a charge of lewd or lascivious conduct in violation of Fla. Stat. § 800.04(6)(b) and was sentenced to five years of sexual offender probation.  The terms of that probation provided that he "qualifie[d] and shall register with the Florida Department of Law Enforcement as a sexual offender pursuant to [Fla. Stat.] § 943.0435."  *See also* Fla. Stat. § 943.0435(1)(h)1.a.(I) (defining a sex offender as any person convicted of various sexual offenses, including a violation of § 800.04).

Nine years later, in 2017, Mr. Clements—proceeding *pro se*—sought federal habeas corpus relief from his conviction pursuant to 28 U.S.C. § 2254.  The state moved to dismiss the petition for lack of jurisdiction because he was not "in custody" under § 2254(a).  Because his probationary sentence had expired in June of 2013, the state argued that Mr. Clements was not in its physical custody at the time he filed his petition.  Mr. Clements responded that his lifetime sex offender registration, "along with all the other restrictions that come with being a registered sex offender," significantly restrained his individual liberty such that he was "in custody" for purposes of § 2254(a).

The district court dismissed Mr. Clements' § 2254 petition for lack of jurisdiction.  Without a controlling Eleventh Circuit decision, the district court found persuasive cases from the Fourth, Fifth, Sixth, Seventh, Ninth, and Tenth Circuits holding that the registration and reporting requirements of various state sex offender statutes were not so onerous as to place persons "in

custody" for purposes of § 2254(a).  The district court explained that the only appellate court to hold otherwise, the Third Circuit, had found the punitive nature of Pennsylvania's sex offender registration statute dipositive.  The Florida sex offender registration statute, in contrast, did not impose a "sentence" and did not constitute "punishment."

Turning to Mr. Clements' arguments, the district court acknowledged that the sex offender registration and reporting requirements were inconvenient.  But it concluded that they did not restrict Mr. Clements' freedom of movement.  Nor did they require Mr. Clements to obtain the state's approval before finding a residence or prevent him from participating in legal activities.  Accordingly, it ruled that Florida's sex offender registration and reporting requirements were collateral consequences of his conviction.

## II

Before addressing the "in custody" question, we summarize the requirements of Florida's sex offender registration and reporting scheme and explain what is—and is not—before us.  We set out the requirements of the scheme in more detail in Part III.C.

## A

In Florida, persons convicted of a qualifying sexual offense—like Mr. Clements—are subject to registration and reporting requirements for life.  *See* Fla. Stat. § 943.0435(1)(h), (11).  Upon initial in-person registration, sex offenders must provide the state with all of their personal and identifying information.   *See*

§ 943.0435(2)(b), (3). This information is generally available to the public. *See* Fla. Stat. § 119.071.

Sex offenders in Florida have an obligation to keep their registration up to date. At a minimum, they must report to their local sheriff's office in person every six months. *See* § 943.0435(14)(a). Any changes with respect to a vehicle or residency or any travel plans must generally be reported in person within 48 hours. *See* § 943.0435(2), (4), (7). Any changes to employment, telephone numbers, email addresses, or internet identifiers must be made online within 48 hours. *See* § 943.0435(4)(e). Failure to report is a felony offense. *See, e.g.*, § 943.0435(8), (9)(a).

## B

After Mr. Clements filed his *pro se* brief, we appointed counsel for him. Counsel chose not to file a separate brief but presented oral argument on behalf of Mr. Clements.

In his brief, Mr. Clements contends that Florida's sex offender registration and reporting requirements place him "in custody" for purposes of § 2254(a). But he also argues for the first time that he is "in custody" in part due to the separate residency restrictions imposed by his sex offender status and by state and local laws. *See, e.g.,* Fla. Stat. § 775.215(2)(a) (stating that a sex offender may not reside within 1,000 feet of any school, childcare facility, park, or playground); Lee County, Fla., Ordinance No. 11-05 (2011) (creating a "Child Safety Zone" that prohibits sex offenders loitering or prowling within 300 feet of certain specified locations that

are primarily designed for or used by children, or areas where children congregate, mirroring Fla. Stat. § 856.022).

Sex offenders in Florida do face a number of residency restrictions in addition to state registration and reporting requirements. But for several reasons we decline to address those residency restrictions in this appeal and leave them for another day. First, as the district court noted, Mr. Clements was not subject to the conditions of his sex offender probation, which expired in 2013, when he filed his § 2254 habeas petition in 2017. Because "'[c]ustody' is determined as of the time of the filing of the petition," *Patel v. United States Attorney General*, 334 F.3d 1259, 1263 (11th Cir. 2003), any residency restrictions resulting from the term of probation are not relevant to the custody issue. Second, in the district court Mr. Clements did not brief the residency restrictions or analyze their impact on the "in custody" determination. Although he mentioned in his response to the state's motion to dismiss that "all the other restrictions that come with being a registered sex offender" rendered him "in custody," he did not set out what those restrictions were. Third, from a factual perspective Mr. Clements did not present any allegations or provide any empirical evidence as to how much land he was practically excluded from due to state and local residency restrictions. As a result, the state's reply discussed only the registration and reporting requirements, and the district court's dismissal order understandably did not go beyond those requirements.

We recognize that Mr. Clements was proceeding *pro se* in the district court.  Nevertheless, the residency restrictions were not litigated below and are not properly before us.  We generally "do not consider issues or arguments raised for the first time on appeal," *Ferguson v. Secretary for the Department of Corrections*, 580 F.3d 1183, 1193 (11th Cir. 2009), even when *pro se* litigants are involved, *see Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998) (per curiam), and given the undeveloped record with respect to the residency restrictions, we see no reason to depart from our normal practice here.  *See Juris v. Inamed Corp.*, 685 F.3d 1294, 1325 (11th Cir. 2012) ("[I]f a party hopes to preserve a claim, argument, theory, or defense on appeal, [it] must first clearly present it to the district court, that is, in such a way as to afford the district court an opportunity to recognize and rule on it.") (citation and quotation marks omitted).

As an appellate court, we do not sit as a collective trier of fact.  Without access to appropriate and detailed maps and plats— at a minimum—we cannot take judicial notice of how much land is covered by state and local residency restrictions in Florida for sex offenders.  This is in part because the residency restrictions that have been cited to us are triggered by and are dependent on the location of certain facilities used or frequented by children (e.g., schools).  We do not know where such facilities are situated, and we do not have the means to sketch out the residency buffer zones as experts might do.  *See* Fed. R. Evid. 201(a)-(b).  *Cf. Wallace v. New York*, 40 F. Supp. 3d 278, 328 & n.43 (E.D. N.Y. 2014) (taking

judicial notice of map, provided by town at court's request, which showed that 45.5% of town's land (40.11 square miles) was not covered by sex offender residency restrictions. Even on appeal, Mr. Clements does not provide the specifics necessary for us to evaluate the effect of the residency restrictions.[1]

Moreover, it is unclear whether local residency restrictions, imposed not by the state but by its municipalities, are properly considered in determining whether a person is "in custody" pursuant to a judgment of a state court for purposes of § 2254(a). Absent briefing on this legal issue, we decline to take it up and resolve it ourselves. We therefore limit our discussion and ruling to whether Florida's sex offender registration and reporting requirements placed Mr. Clements "in custody."

## III

The "in custody" requirement of § 2254(a) is jurisdictional, so we must address it first and before any merits-related matters like the applicable statute of limitations. *See Maleng v. Cook*, 490 U.S. 488, 490, 493-94 (1989); *Diaz v. State of Fla. Fourth Jud. Cir. ex*

---

[1] Examples of scholarly articles trying to contextualize and quantify the effect of certain sex offender residency restrictions include Songman Kang, *The Consequences of Sex Offender Residency Restriction: Evidence from North Carolina*, 49 Int'l Rev. of L. & Econ. 10 (2017); Jacqueline A. Berenson & Paul S. Appelbaum, *A Geospatial Analysis of the Impact of Sex Offender Residency Restrictions in Two New York Counties*, 35 L. & Hum. Behav. 235 (2011); and Paul Zandbergen et al., *Residential Proximity to Schools and Daycares: An Empirical Analysis of Sex Offense Recidivism*, 37 Crim. Just. & Beh. 482 (2010).

*rel. Duval Cnty.*, 683 F.3d 1261, 1263 (11th Cir. 2012). Our review of the district court's dismissal of Mr. Clements' habeas corpus petition is plenary. *See Diaz*, 683 F.3d at 1263.[2]

## A

In *Wales v. Whitney*, 114 U.S. 564 (1885), the Supreme Court addressed the question of custody in a habeas corpus case arising out of a pending court-martial proceeding. The petitioner, the medical director (and former surgeon general) of the navy, was served with an order of the secretary of the navy which (1) informed him that he was to be tried by a court-martial, (2) told him that he was "placed under arrest," and (3) instructed him to "confine [him]self to the limits" of Washington, D.C. *See id.* at 566. The petitioner—who was not physically detained—sought habeas corpus relief with respect to the court-martial, but the Supreme Court ruled that he was not in custody and could not avail himself of the writ. First, he was "under no physical restraint" and was able to "walk[ ] the streets of Washington with no one to hinder his movements[.]" *Id.* at 569. Second, to the extent that he was

---

[2] Other federal habeas corpus and post-conviction statutes, like those codified as 28 U.S.C. §§ 2241(c)(1)-(4) & 2255(a), contain the same "in custody" language as § 2254(a). Because of the identical phrasing, we cite to and discuss "in custody" decisions involving these statutes in our opinion. *See* 3 Sarah N. Welling, Fed. Prac. & Proc. Crim. § 630 (5th ed. & Nov. 2022 update) ("[The term 'in custody'] has exactly the same meaning for § 2255 actions as it does for § 2254 habeas corpus applications, . . . and habeas corpus cases can be looked to as authority for the term in § 2255.").

ordered to stay in Washington, that was no more than he was required to do as medical director of the navy before he was served with the secretary's order. *See id.* at 570 ("If there is no restraint there is no right in the civil [habeas] court to interfere."). Third, if he decided to leave Washington, his arrest would require another order from the secretary. *See id.* at 572.

The Supreme Court explained that "[s]omething more than moral restraint is necessary to make a case for habeas corpus. There must be actual confinement or the present means of enforcing it." *Id.* at 571-72 (italics deleted). Citing with approval to a state case holding that a person granted bail was not in custody for purposes of habeas corpus, the Court concluded that under the circumstances there was no "actual restraint" on the petitioner's personal liberty. *See id.* at 573-75 (citing *Respublica v. Arnold*, 3 Yeates 263 (Pa. 1801)).

This understanding of custody remained the same through the first half of the 20th century. The rule continued to be that "[w]ithout restraint of liberty, the writ [of habeas corpus] w[ould] not issue." *McNally v. Hill*, 293 U.S. 131, 138 (1934). Our predecessor, the former Fifth Circuit, therefore remarked in 1938 that a "prisoner out on parole probably cannot maintain habeas corpus against anyone. No one has his body in custody, or could lawfully arrest him by virtue of his parole status so long as he observes its conditions." *Van Meter v. Sanford*, 99 F.2d 511, 511 (5th Cir. 1938).

Things changed in the early 1960s with *Jones v. Cunningham*, 371 U.S. 236 (1963), in which the Supreme Court

unanimously held that a defendant released on parole was "in custody" for purposes of 28 U.S.C. § 2241, one of the federal habeas corpus statutes. The Supreme Court cited to an 18th-century English case, *Rex v. Clarkson*, 1 Strange 444, 445, 93 Eng. Rep. 625 (K.B. 1722), where the tribunal inquired whether the person on whose behalf the writ was sought was under "illegal restraint" but did not grant relief because she was "at her liberty to go where she please[s]." *See Jones*, 371 U.S. at 238-39 & nn. 4-7. Surveying other relevant decisions, the Court explained that "[h]istory, usage and precedent can leave no doubt that, besides physical imprisonment, there are other restraints on a man's liberty, restraints not shared by the public generally, which have been thought sufficient in the English-speaking world to support the issuance of habeas corpus." *Id.* at 240.

The petitioner in *Jones* was confined "to a particular community, house, and job at the sufferance of his parole officer[,]" could not "drive a car without permission[,]" had to "periodically report to his parole officer, permit the officer to visit his home and job at any time," and generally had to "follow the officer's advice." *Id.* at 242. "He [was] admonished to keep good company and good hours, work regularly, keep away from undesirable places, and live a clean, honest, and temperate life." *Id.* A violation of any restriction could result in his immediate imprisonment. *See id.* The Supreme Court analogized parole to more traditional, physical restrictions upon liberty, but stressed that the writ "is not now and never has been a static, narrow, formalistic remedy; its scope has

grown to achieve its grand purpose." *Id.* at 243. It reasoned that the petitioner had satisfied the "in custody" requirement because the attendant conditions and restrictions significantly restrained his freedom. *See id.* at 242-43. "Such restraints," the Court held, were "enough to invoke the help of the Great Writ." *Id.* at 243. *See also Carafas v. LaVallee*, 391 U.S. 234, 239-40 (1968) (extending the "in custody" requirement to situations where a petitioner files the writ while incarcerated but is unconditionally released from his sentence while awaiting appellate review).

In the 1970s and 1980s, the Supreme Court extended the *Jones* rationale to release on personal recognizance. *See Hensley v. Mun. Ct.*, 411 U.S. 345, 351-52 (1973) (release pending appeal); *Lydon*, 466 U.S. at 301 (release pending retrial). The petitioner in *Hensley* could not "come and go as he please[d]," and his "freedom of movement rest[ed] in the hands of state judicial officers, who [could] demand his presence at any time and without a moment's notice." *Hensley*, 411 U.S. at 351-52 (further explaining the necessity of habeas relief in this instance to avoid imprisonment without an adequate federal remedy). Likewise, the petitioner in *Lydon* was subject to restraints not shared by the public generally because he was obligated to appear for trial on a specified date or face criminal charges, could "not depart without leave," and had to "keep the peace and be of good behavior." *Lydon*, 466 U.S. at 301

(citation omitted).  These cases reaffirmed and solidified the modern (and broad) understanding of the "in custody" requirement.[3]

Despite its breadth and flexibility, the "in custody" requirement retains a tensile strength.  For example, the Supreme Court has explained that "once the sentence imposed for a conviction has completely expired, the collateral consequences of that conviction are not themselves sufficient to render an individual 'in custody' for the purposes of a habeas attack upon it."  *Maleng*, 490 U.S. at 491-92 (providing as examples of collateral consequences the "inability to vote, engage in certain businesses, hold public office, or serve as a juror").  "[A] contrary ruling would mean that a petitioner whose sentence has completely expired could nonetheless challenge the conviction for which it was imposed at any time on federal habeas."  *Id.* at 492.  *See, e.g., Westberry v. Keith*, 434 F.2d 623, 624-25 (5th Cir. 1970) (holding that the imposition of a fine and

---

[3] In describing these Supreme Court decisions, and attempting to summarize their holdings, we have endeavored to note the rationale provided and the facts that were deemed material to the outcome.  It is not just what the Court says, but what it does, that matters.  *See Texas & P. Ry. Co. v. La. Oil Refin. Corp.*, 76 F.2d 465, 467 n.4 (5th Cir. 1935) ("The ratio decidendi, the reason for the decision, the principle of the case, is not found in the reasons or the rule of law set forth in the opinion, nor by a consideration of all of the ascertainable facts of the case and the [court's] decision . . . [but rather] by taking account of the facts treated by the [court] as material and [its] decision upon them, taking also into account those facts treated by [the court] as immaterial.") (citation and internal quotation marks omitted).

the revocation of a driver's license for a year did not render the defendant "in custody" under § 2254).[4]

## B

At the time Congress first placed the "in custody" language in § 2254, sex offender registration and reporting statutes "were not remotely within anyone's contemplation." *Wilson v. Flaherty*, 689 F.3d 332, 340 (4th Cir. 2012) (Davis, J., concurring). So we are tasked with applying "in custody" precedent to a fairly new reality.

As noted, the great majority of the circuits have held that persons subject to sexual offender registration and reporting statutes are not "in custody" for purposes of habeas corpus relief. *See Williamson v. Gregoire*, 151 F.3d 1180, 1183-84 (9th Cir. 1998) (Washington); *Henry v. Lungren*, 164 F.3d 1240, 1241-42 (9th Cir. 1999) (California); *McNab v. Kok*, 170 F.3d 1246, 1247 (9th Cir. 1999) (Oregon); *Leslie v. Randle*, 296 F.3d 518, 521-23 (6th Cir. 2002) (Ohio); *Virsnieks v. Smith*, 521 F.3d 707, 719-20 (7th Cir. 2008) (Wisconsin); *Wilson*, 689 F.3d at 335-39 (Texas and Virginia); *Calhoun v. Att'y Gen. of Colo.*, 745 F.3d 1070, 1073-74 (10th Cir. 2014) (Colorado); *Sullivan v. Stephens*, 582 F. App'x 375, 375 (5th Cir. 2014) (Texas); *Hautzenroeder v. Dewine*, 887 F.3d 737, 739-40 (6th Cir. 2018) (Ohio); *Munoz v. Smith*, 17 F.4th 1237, 1244 (9th Cir. 2021) (Nevada). Only the Third Circuit has come to a contrary

---

[4] We recognize that the Supreme Court decided *Maleng* at a time when §§ 2254 and 2255 did not have limitations periods. That is no longer the case. *See* §§ 2254(d) & 2255(f).

conclusion.  *See Piasecki v. Ct. of Common Pleas, Buck Cnty., Pa.*, 917 F.3d 161, 177 (3d Cir. 2019) (Pennsylvania).[5]

Normally, we might begin by discussing (and giving serious consideration to) the decisions of our sister circuits, but here those decisions are of limited assistance because sex offender and registration statutes differ (sometimes greatly) from state to state and change over time.  *See* Calaway, *Sex Offenders*, 92 St. John L. Rev. at 780 ("Courts generally cite to a series of cases across the circuits that have declined to expand the definition of custody to individuals under a sex offender registration law.  The issue with this analysis is that the statutory schemes at issue across the states vary markedly in their restrictions and requirements.") (footnotes omitted).  Nevertheless, we cite to and refer to those decisions where appropriate.

---

[5] A number of commentators take the position that, as a general matter, sex offender registration and reporting statutes place offenders "in custody" for federal habeas corpus and post-conviction purposes.  *See* Katherine A. Mitchell, *Of What Consequence?: Sexual Offender Laws and Federal Habeas Relief*, 75 U. Miami L. Rev. 76, 100-04 (2020); Wendy R. Calaway, *Sex Offenders, Custody and Habeas*, 92 St. John's L. Rev. 755, 768-93 (2018); Kimberley A. Murphy, *The Use of Federal Writs of Habeas Corpus to Release the Obligation to Report under State Sex Offender Statutes: Are Defendants "In Custody" for Purposes of Habeas Corpus Review?*, 2000 L. Rev. M.S.U.-D.C.L. 513, 536-41 (2000); Tina D. Santos, *Williamson v. Gregoire: How Much is Enough? The Custody Requirement in the Context of Sex Offender Registration and Notification Statutes*, 23 Seattle U. L. Rev. 457, 476-79 (1999).

## C

To recap and fully detail the requirements of Florida's scheme, sex offenders like Mr. Clements are subject to registration and reporting requirements for life. *See* Fla. Stat. § 943.0435(1)(h), (11). Upon initial registration, which must be in person, sex offenders must provide the state with all of their personal and identifying information, secure a state driver's license or state identification card, and provide a set of fingerprints. *See* § 943.0435(2)(b), (3). This information—including the offender's picture, date of birth, addresses, vehicles, and sexual offense convictions—is available to the public unless exempt or confidential. *See* Fla. Stat. § 119.071.

Sex offenders have an obligation to keep their registration up to date. At a minimum, they must report to their local sheriff's office in person every six months. *See* § 943.0435(14)(a). Any changes with respect to a vehicle or residence must be reported in person within 48 hours. *See* § 943.0435(2), (4). Sex offenders who become transient or homeless must report in person within 48 hours any shelter or location (including those with no specific address) at which they spend more than three days on aggregate in a calendar year, and report in person every 30 days thereafter. *See* §§ 943.0435(4)(b)2 & 775.21(2)(o). Sex offenders must update their driver's licenses within 48 hours of the renewal date or of any change in name or address. *See* § 943.0435(4)(a). Sex offenders who plan to leave the state must report in person 48 hours beforehand, or at least 21 days before any international trip of five days or more. *See* § 943.0435(7). Any changes to employment,

telephone numbers, email addresses, or internet identifiers must be made online within 48 hours. *See* § 943.0435(4)(e). Failure to report generally is a third-degree felony offense, with violations of certain reporting requirements related to residency being second-degree felonies. *See, e.g.*, § 943.0435(8), (9)(a).

Florida's sex offender registration and reporting statute also contains several legislative findings. First, sex offenders "often pose a high risk of engaging in sexual offenses even after being released," and therefore "have a reduced expectation of privacy because of the public's interest in public safety and in the effective operation of government." § 943.0435(12). Second, "[t]he designation of a person as a sexual offender is not a sentence or a punishment but is simply the status of the offender which is the result of a conviction for having committed certain crimes." *Id.*

## D

The question is whether the reporting and registration requirements constitute a sufficient restraint on the personal liberty of sex offenders in Florida to render someone like Mr. Clements "in custody." Supreme Court and Eleventh Circuit cases make this a hard question to answer.

We have said that the "in custody" requirement should be construed "very liberally." *Howard v. Warden*, 776 F.3d 772, 775 (11th Cir. 2015) (citation omitted). To that end, we have held that non-citizens released on supervision while awaiting a final decision in their immigration proceedings are deemed to be "in custody" for

purposes of habeas corpus. *See United States ex rel. Marcello v. Dist. Dir. of INS, New Orleans*, 634 F.2d 964, 971 & n.11 (5th Cir. 1981) (petitioner subject to deportation order was "in custody" for federal habeas corpus purposes because he was on supervised parole, he had to report quarterly to immigration authorities, and he had to notify those authorities if he intended to leave the state for more than 48 hours); *Romero v. Sec'y, DHS*, 20 F.4th 1374, 1379 (11th Cir. 2021) (applying *Marcello* and holding that petitioner, who was subject to a deportation order, was "in custody" under § 2241 because she was in an immigration supervision program, had to appear in person at the government's request, could not travel outside the state for more than 48 hours without advance notice, was required to apprise the government of any changes in residence or employment, had to participate in a more stringent supervision program if directed to do so, and was subject to a plan of action which required her to depart the country or be forcibly removed). In contrast, we have held that a dead-docketed indictment, pending for more than 19 years, did not place the petitioner "in custody" because it did "not currently subject [him] to any reporting requirements, or limit his ability to work, travel, or reside where he pleases." *Howard*, 776 F.3d at 776.

*Marcello* and *Romero* lend some support to Mr. Clements' position. To use just two of the registration and reporting obligations in *Marcello* and *Romero* as markers, Mr. Clements—like the petitioners in those two cases—has to report in person to the authorities periodically and has to provide advance notification if he

is going to leave the state (two days' notice for domestic trips and 21 days' notice for international trips). *Compare Marcello*, 634 F.2d at 971 & n.11; *Romero*, 20 F.4th at 1379. Mr. Clements, in fact, must provide that advance notification in person, making the requirement more burdensome and restrictive of his personal liberty. But the petitioners in *Marcello* and *Romero* were situated differently from Mr. Clements in a significant way—both were subject to deportation orders from the federal government when they were released with conditions. Mr. Clements is under no similar order of expulsion from the country or the state, and we believe that is an important distinction for purposes of the "in custody" analysis.

As *Jones* explained, "what matters" is whether the legal requirements in question "significantly restrain [the person's] liberty to do those things which in this country free men are entitled to do." 371 U.S. at 242-43. For our part, we have said that the "in custody" requirement "is satisfied if restrictions have been placed on a petitioner's freedom of action or movement." *Djadju v. Vega*, 32 F.4th 1102, 1106 (11th Cir. 2022) (§ 2241 case interpreting *Jones*). *Accord* Note, *Developments in the Law—Federal Habeas Corpus: Custody and Remedy*, 83 Harv. L. Rev. 1038, 1073 & n.5 (1970) (asserting that whether a given set of legal restraints place a person "in custody" should be determined based on "the severity of the restraints").

In our view, the proper inquiry here under *Jones* and its progeny is whether Florida's registration and reporting

requirements substantially limit Mr. Clements' actions or movement. *See Williamson*, 151 F.3d at 1183; *Leslie*, 296 F.3d at 522; *Virsnieks*, 521 F.3d at 718. *See also* 1 Randy Hertz & James S. Liebman, Federal Habeas Corpus and Procedure § 8.2[a], at 461 (7th ed. 2021) (explaining that "any person who cannot come and go and as she pleases" satisfies the "in custody" requirement); *Custody and Remedy*, 83 Harv. L. Rev. at 1078 (asserting that, even after *Jones*, "some restraint on [the] petitioner's liberty more substantial than civil disabilities is required"). Though habeas corpus is no longer simply a remedy for unlawful physical custody, the focus on liberty of movement at least has the benefit of "comport[ing] with the original conception of the writ as a remedy for unlawful restriction of physical mobility." *Custody and Remedy*, 83 Harv. L. Rev. at 1076. And it provides a stopping point of sorts for the concept of being "in custody." *See Howard*, 776 F.3d at 775 ("[A]lthough the word 'custody' is elastic, all definitions of it incorporate some concept of ongoing control, restraint, or responsibility by the custodian.") (citation and quotation marks omitted). *Cf. Hensley*, 411 U.S. at 354 (Blackmun, J., concurring in the result) (explaining that, given the trajectory of the Supreme Court's broad understanding of custody, "[o]ne wonders where the end is").[6]

———————————

[6] Justice O'Connor sketched out a different "in custody test" in *Lydon*: "[A] state [offender] should be considered 'in custody pursuant to the judgment of a [s]tate court' . . . only where he is under physical restraint, or under a legal restraint that can be converted into physical restraint without a further judicial

We acknowledge, of course, that the lifetime registration and reporting requirements imposed on Mr. Clements by Florida law are demanding and not the sort of obligations and restraints "shared by the public generally[.]" *Jones*, 371 U.S. at 240. Nevertheless, the requirements are less oppressive in terms of personal liberty than the restraints faced by the parolee in *Jones*, 371 U.S. at 242, or the persons released on personal recognizance bonds in *Hensley*, 411 U.S. at 351-52, and *Lydon*, 466 U.S. at 301, or the noncitizens subject to deportation and under supervision in *Marcello*, 634 F.2d at 971 & n.11, and *Romero*, 20 F.4th at 1379. After a quantitative and qualitative analysis, we conclude—admittedly with some hesitation—that as a whole Florida's registration and reporting requirements for sex offenders did not render Mr. Clements "in custody" at the time he filed his habeas corpus petition.

First, though Mr. Clements has to report in person to the authorities periodically and provide them with all sorts of information and updates, he knows exactly when he must do so: during his birthday month and six months thereafter. *See* Fla. Stat. § 943.0435(14)(a). He is not at the beck and call of state officials, and those officials cannot "demand his presence at any time and without a moment's notice." *Hensley*, 411 U.S. at 351. *Compare Romero*, 20 F.4th at 1379 (noncitizen subject to removal was "in custody" in part because she was required to "appear in person at

---

hearing." *Lydon*, 466 U.S. at 339 (O'Connor, J., concurring in the judgment) (citation omitted). But her proposal did not garner a majority of the Court.

the government's request"). Under the circumstances, the periodic in-person reporting did not place Mr. Clements "in custody." *See Henry*, 164 F.3d at 1242 (holding that in-person registration was not a severe enough restriction to place a sex offender "in custody").

Second, Mr. Clements is not required to live in a certain community or home and does not need permission to hold a job or drive a car. *Compare Jones*, 371 U.S. at 242. And he can engage in legal activities without prior approval or supervision. *See Hautzenroeder*, 887 F.3d at 741 (pointing out that under Ohio's sex offender registration and reporting statutes the petitioner was not "prohibited from engaging in any legal activities"); *Wilson*, 689 F.3d at 338 (recognizing the same for the sex offender statutes of Virginia and Texas).

Third, Mr. Clements has to provide in-person advance notice of trips outside the state and outside the country, but the trips themselves do not require permission or approval by state officials. *See Williamson*, 151 F.3d at 1184 (noting that Washington's sex offender registration statute did not limit where offenders could go). Mr. Clements can—subject to the residency restrictions which we leave for another day—generally "come and go as he pleases[,]" and his "freedom of movement" does not "rest[ ] in the hands" of state officials. *See Hensley*, 411 U.S. at 351.

In reaching our conclusion, we have also considered the Supreme Court's decision in *Smith v. Doe*, 538 U.S. 84, 105-06 (2003), which held that the retroactive application of Alaska's sex offender

registration law did not violate the *Ex Post Facto* Clause because the law was not punitive.  *See also Houston v. Williams*, 547 F.3d 1357, 1364 (11th Cir. 2008) (relying on *Smith* in holding that Florida's sex offender registration statute did not violate the *Ex Post Facto* Clauses of the Florida and the U.S. Constitutions).  In our view, some aspects of the analysis in *Smith* counsel against a conclusion that Mr. Clements was "in custody" due to Florida's sex offender registration and reporting requirements.[7]

In one part of its opinion, the Supreme Court in *Smith* addressed whether the Alaska law imposed an "affirmative disability or restraint" on sex offenders.  *See Smith*, 538 U.S. at 99-100.  The Court concluded that it did not for a number of reasons.  For starters, the law did not "restrain activities sex offenders may pursue [and] leaves them free to change jobs or residences." *Id.* at 100.  In addition, "[a]lthough the public availability of the information [posted online] may have a lasting and painful impact on the convicted sex offender, th[o]se consequences flow not from the [law's]

---

[7] In analyzing the matter of custody, some circuits have considered whether a sex offender law is punitive or remedial.  *See Piasecki*, 917 F.3d at 175; *Hautzenroeder*, 887 F.3d at 744; *Leslie*, 296 F.3d at 522-23; *Calhoun*, 745 F.3d at 1074.  With respect, we do not think the punitive/remedial distinction is very helpful, for Supreme Court and Eleventh Circuit precedent demonstrates that custody under the habeas statutes does not require criminal punishment.  For example, in *Lydon*, the petitioner's criminal conviction had been vacated pending retrial.  *See* 466 U.S. at 300.  And in our immigration cases neither petitioner was subject to a criminal judgment.  *See Marcello*, 634 F.2d at 966; *Romero*, 20 F.4th at 1377.

registration and dissemination provisions, but from the fact of con-
viction, already a matter of public record." *Id.* at 101. Finally, the
argument that the law was akin to probation or supervised release
had "some force," but it did not carry the day because sex offenders
subject to the law were "free to move where they wish and to live
and work as other citizens, with no supervision." *Id.*

　　We recognize that *Smith*—which did not address the mean-
ing of the phrase "in custody" in the habeas context—is not con-
trolling. And we realize that on its facts *Smith* is also not a perfect
fit. For example, the Supreme Court noted that the updating of
information by sex offenders in Alaska did not have to be in person.
*See id.* at 100. Although Florida does not require that all changes of
information be made in person, *see, e.g.,* § 943.0435(4)(a), an of-
fender like Mr. Clements must appear in person at the sheriff's of-
fice for (a) his initial registration, (b) two annual visits, (c) changes
to his vehicle or residence, and (d) trips outside of the state or coun-
try. That makes Florida's sex offender registration and reporting
requirements different (and more burdensome) than Alaska's at the
time *Smith* was decided. Despite the differences, we conclude that
Mr. Clements was not "in custody" due to Florida's registration
and reporting requirements for sex offenders. The restrictions on
freedom of movement are not severe enough. *Cf. United States v.
Juvenile Male*, 560 U.S. 558, 560-61 (2010) (dicta: "Perhaps the most
likely potential 'collateral consequenc[e]' that might be remedied
by a judgment in [the government's] favor is the requirement that

[the defendant] remain registered as a sex offender under Montana law.").

After giving the matter due consideration, we choose not to follow the Third Circuit's contrary decision in *Piasecki,* 917 F.3d at 177, which held that Pennsylvania's sex offender statute satisfied § 2254's "in custody" requirement. For starters, *Piasecki* is distinguishable on its facts because Pennsylvania imposes more onerous reporting and registration requirements on sex offenders than Florida. *See Munoz,* 17 F.4th at 1244 ("*Piasecki* involved much more burdensome conditions than those addressed in our prior cases."). Mr. Piasecki, for example, had to appear in person four times a year for the rest of his life, was required to update all of his personal and identifying information in person, and had no "computer internet use." *See Piasecki*, 917 F.3d at 164-65. As we have explained, the "in custody" inquiry considers the severity—the degree—of the restraints. The cumulative effect of the restrictions on Mr. Piasecki's autonomy was more akin to physical custody than what we have here. In addition, the Third Circuit in *Piasecki* acknowledged that its prior precedent concerning a sentence of community service supported an "in custody" finding due to Mr. Piasecki's obligation to report his travel, even in the absence of a pre-approval requirement. *See id.* at 172 (citing *Barry v. Bergen Cnty. Prob. Dep't*, 128 F.3d 152, 161 (3d Cir. 1997) (holding that requirement of 500 hours in county community service program, imposed as part of the sentence, rendered a defendant "in custody")). There is no such analogous precedent in the Eleventh Circuit. The Third Circuit

recognized that it had "departed from the courts that ha[d] held that registration requirements are not custodial because they do not require pre-approval from the government before a registrant travels, thus not limiting his or her ability to move freely." *Id.*

Mr. Clements submits that we should consider the stigma of being labeled a sex offender. But any fear or embarrassment that he may suffer as a result of his sex offender designation is not in and of itself a restraint on his liberty. *See Carter v. Att'y Gen.*, 782 F.2d 138, 140 n.1 (10th Cir. 1996) (explaining that, under *Jones* and its progeny, a habeas applicant "must labor under liberty restraints more severe than the stigma of a prior criminal conviction"). The stigma is not a condition imposed by Florida and is a practical consequence of the nature of Mr. Clements' conviction. Florida "does not make the publicity and the resulting stigma an integral part of the objective of [its] regulatory scheme." *Smith*, 538 U.S. at 99.

## IV

Florida's lifetime registration and reporting requirements for sex offenders did not place Mr. Clements "in custody" under § 2254(a). We therefore affirm the district court's dismissal of his habeas corpus petition for lack of jurisdiction.

**AFFIRMED.**

Newsom, Circuit Judge, concurring:

The majority opinion faithfully applies current doctrine, which obliges a court determining whether an individual is "in custody" within the meaning of the federal habeas corpus statutes to engage in an amorphous, eye-of-the-beholder inquiry: Is the petitioner subject to conditions that "significantly restrain [his] liberty to do those things which in this country free men are entitled to do"? *Jones v. Cunningham*, 371 U.S. 236, 243 (1963). And in applying the *Jones* "test"—such as it is—to hold that Mr. Clements is not "in custody," the majority reaches what I think to be the correct result in this particular case. Accordingly, I join the majority opinion in full.

I write separately because I have come to believe that *Jones* was a misstep. It marked a radical departure from the original and long-settled understanding of the term "custody," and the nebulous things-that-free-men-can-do standard that it prescribed confers nearly limitless discretion on individual judges. I would return to ordinary meaning: An individual is "in custody" for habeas corpus purposes if, but only if, he is under close physical confinement.

Let me explain.

# I

"Custody" has been an essential feature of—and prerequisite to—habeas corpus relief since the Founding. The Judiciary Act of 1789 forbade the newly created federal courts to grant the writ to "prisoners in gaol, unless where they are *in custody*, under or by

colour of the authority of the United States." 1 Stat. 73, 82 (1789) (emphasis added). So too, when Congress extended the privilege of the writ to state prisoners in 1867, it required a petitioning inmate to specify, among other things, "in whose custody he or she is detained." 14 Stat. 385, 385–86 (1867). And when, some 80 years later, Congress codified the writ in its present form, it again predicated relief on a petitioner's demonstration that he was "in custody." The general habeas provision, titled "Power to Grant Writ," states that "[t]he writ of habeas corpus shall not extend to a prisoner unless . . . [h]e is in custody." 28 U.S.C. § 2241(c). And more targeted provisions—applicable to state and federal prisoners, respectively—authorize federal courts to entertain post-conviction petitions brought by those who are "in custody pursuant to the judgment of a [s]tate court," *id.* § 2254(a), and those who are "in custody under sentence of a court established by Act of Congress," *id.* § 2255(a).

## A

The crucial question, then: What is meant by the key term "custody"? For centuries, there wasn't any doubt about that: It meant close physical confinement. Samuel Johnson's 1755 English dictionary, for instance, defined the word by reference to "imprisonment." 1 Samuel Johnson, *A Dictionary of the English Language* 532 (1755). As did Noah Webster's 1828 American dictionary. *See* Noah Webster, *American Dictionary of the English Language* 516 (1828) ("[i]mprisonment; confinement; restraint of liberty"). Successive editions of *Black's* defined the term in exactly the same way.

The inaugural installment, for instance, explained that "custody" meant "the detainer of a man's person by virtue of lawful process or authority; actual imprisonment." It then elaborated: "In a sentence that the defendant 'be in custody until,' etc., this term imports actual imprisonment. The duty of the sheriff under such a sentence is not performed by allowing the defendant to go at large under his general watch and control." *Black's Law Dictionary* 312 (1st ed. 1891); *accord Black's Law Dictionary* 309 (2d ed. 1910) (same); *Black's Law Dictionary* 493–94 (3d ed. 1933) (same).

The close-confinement understanding of the term "custody" is confirmed by the writ's origin and early application. Let's start with the Latin: Translated literally, "habeas corpus" means "(that) you have the body"—plainly a reference to the subject's actual, physical detention. *Webster's New International Dictionary* 1121 (2d ed. 1944). And the history of the writ's development in Stuart England perfectly comports with the Latin connotation. That story has been told elsewhere, *see Boumediene v. Bush*, 553 U.S. 723, 739–42 (2008), so I'll limit myself to a few key highlights. In 1627, Parliament enacted the famous Petition of Right, which stated that no one should be "imprisoned without any cause" and that "no freeman, in any such manner as is before mencioned [shall] be imprisoned or deteined." 16 Charles 1, ch. 1, § 8. When Parliament continued to face royal intransigence, it passed a second statute, the Habeas Corpus Act of 1640, which condemned the "great delays" imposed "by sheriffs, gaolers, and other officers, to whose custody, any of the King's subjects have been committed for

criminal, or supposed criminal matters, in making returns of writs of habeas corpus to them directed." 16 Charles 1, ch. 10. Finally, in 1679, Parliament further tightened the screws: It gave jailers a presumptive three-day deadline for delivering the bodies of those "in . . . their Custody." 31 Charles 2, ch. 2. There can be little doubt that Parliament's serial codifications of the habeas remedy indicate a concern for prisoners in actual, physical "custody"—*i.e.*, "imprison[ment]," "dete[ntion]," "commit[ment]."

Wholly unsurprisingly, Blackstone described the writ in similar terms. He characterized habeas corpus as a remedy for "removing the injury of unjust and illegal confinement"—"confinement," he said, being synonymous with "imprisonment." 3 Blackstone, *Commentaries on the Laws of England*, ch. 8, p. 137 (1768) (emphasis omitted); *see also* 1 Blackstone, *Commentaries*, ch. 1, p. 132 (1765) (defining "confinement" as "imprisonment"). To be sure, Blackstone recognized that "imprisonment" didn't necessarily denote formal incarceration—it could be accomplished, for instance, by "keeping a man against his will in a private house, putting him in the stocks, [or] arresting or forcibly detaining him in the street." 1 Blackstone, *Commentaries*, ch. 1, p. 132. But as his examples demonstrate, Blackstone clearly viewed habeas as a remedy for those who were in close physical confinement.

## B

So, importantly, did American jurists after the Revolution. Parliament's 1679 act was the "genesis" of "[v]irtually all American habeas corpus legislation." Dallin H. Oaks, *Habeas Corpus in the*

*States—1776-1865*, 32 U. Chi. L. Rev. 243, 251 (1965). And as already explained, the Judiciary Act of 1789 described the writ as a means of "inquir[ing] into the cause of commitment" and limited the class of eligibles to "prisoners in gaol"—and, in particular, those prisoners who could prove that they were "in custody, under or by colour of the authority of the United States." 1 Stat. at 82.

"Early state court decisions in this country were in agreement that the Habeas Corpus Act" covered only "persons who were within the four walls of a prison." Dallin H. Oaks, *Legal History in the High Court—Habeas Corpus*, 64 Mich. L. Rev. 451, 469 (1966) (quotations and citations omitted). Take, for example, *Respublica v. Arnold*, 3 Yeates 263 (Pa. 1801). There, an individual who was free on bail sought habeas corpus relief. The Pennsylvania Supreme Court refused his request on the ground urged by the Commonwealth: that the state's habeas statute—a verbatim copy of England's 1679 act—didn't "refer to any other cases, than where the party applying is *in gaol, in actual custody.*" *Id.* at 264 (emphasis added). So too, *State v. Buyck*, 3 S.C.L. 460 (S.C. Const. App. 1804), in which a person charged with forgery but out on his own recognizance sought habeas relief. The court denied the petition because "the provisions of the habeas corpus act[] extend only to persons *actually in prison*, and not to persons under recognizance, and at large upon bail." *Id.* at 461 (emphasis added).

And so the law remained for almost two centuries: "Until the 1960s, courts interpreted the custody requirement strictly." Richard H. Fallon, Jr., et al., *Hart & Wechsler's The Federal Courts*

*and the Federal System* 1354 (7th ed. 2015). Foremost among those "courts" was the United States Supreme Court, which uniformly respected the settled understanding that "custody"—as a necessary precondition to habeas corpus relief—entailed actual, physical confinement. *Wales v. Whitney*, 114 U.S. 564 (1885), is illustrative. There, the former surgeon general of the Navy, having been accused of "dereliction[] of duty" and given strict orders not to leave Washington, D.C., sought a writ of habeas corpus. Rejecting his request, the Supreme Court thought it "obvious" that the petitioner was "under no physical restraint," as he could "walk[] the streets of Washington with no one to hinder his movements." *Id.* at 567, 569. That fact, the Court held, was dispositive: "[T]o make a case for habeas corpus," the Court said, "[t]here must be actual confinement" or the imminent threat thereof. *Id.* at 571–72. *Stallings v. Splain*, 253 U.S. 339 (1920), is to the same effect. In that case, a petitioner indicted for embezzlement but (effectively) out on bail unsuccessfully sought habeas relief. The Court explained that it was "well settled that under such circumstances a petitioner is not entitled to be discharged on habeas corpus." *Id.* at 343 (citing *Republica* and *Buyck*). "Being no longer under actual restraint," the petitioner "was not entitled to the writ of habeas corpus." *Id.* (citing *Wales*).

\* \* \*

The picture that emerges from any honest appraisal of the historical record—stretching back hundreds of years—is clear: "If there was any single feature that characterized the writ of habeas

corpus in both its early statutory and common-law forms, it was the requirement that adult prisoners be subject to an immediate and confining restraint on their liberty." Oaks, *Legal History*, *supra*, at 469. And that original understanding persisted well into the 20th century: "Only a person in actual custody [was] entitled to the writ of habeas corpus." Note, *Remedies Against the United States and Its Officials*, 70 Harv. L. Rev. 827, 865 (1957); *see also* Note, *Federal Habeas Corpus Review of "Final" Administrative Decisions*, 56 Colum. L. Rev. 551, 551 n.7 (1956) (describing the actual-custody requirement as a "doctrine … basic to habeas corpus review").

## II

Then came the 1960s—when, as the majority says, "[t]hings changed." Maj. Op. at 11. To call that an understatement would be, well, an understatement. As the leading federal-courts treatise has explained, in 1963 the Supreme Court "revolutionized" the meaning of the term "custody" in *Jones v. Cunningham*, 371 U.S. 236 (1963). *See* Hart & Wechsler, *supra*, at 1354.

In *Jones*, the Supreme Court unanimously concluded that a state prisoner who was out on parole was, despite his release, "in custody" within the meaning of the general federal habeas corpus statute, 28 U.S.C. § 2241. In so holding, the Court acknowledged that "the chief use of habeas corpus ha[d] been to seek the release of persons held in actual, physical custody in prison or jail." 371 U.S. at 238. But citing to a mishmash of obscure cases involving spouses and children, aliens seeking entry at the border, and

military enlistees, the Court decreed that the writ "can do more" than "reach behind prison walls and iron bars." *Id.* at 243. Habeas, the Court said, "is not now and never has been a static, narrow, formalistic remedy"; rather, "its scope has grown to achieve its grand purpose" of protecting individual liberty more generally. *Id.* Accordingly, the Court concluded—in soaring terms—that what matters is whether the conditions to which a petitioner is subject "significantly restrain [his] liberty to do those things which in this country free men are entitled to do." *Id.*

In holding that the petitioner before it qualified under that standard, the Court pointed to a grab-bag of considerations: He (1) was "confined by the parole order to a particular community, house, and job at the sufferance of his parole officer"; (2) couldn't "drive a car without permission"; (3) had to "periodically report to his parole officer, permit the officer to visit his home and job at any time, and follow the officer's advice"; and (4) was "admonished to keep good company and good hours, work regularly, keep away from undesirable places, and live a clean, honest, and temperate life." *Id.* at 242. "Such restraints," the Court held—without further elaboration—"are enough to invoke the help of the Great Writ." *Id.* at 243.

Under *Jones*'s things-that-free-men-can-do standard, the class of petitioners who qualify for in-custody status has ballooned. In *Hensley v. Municipal Court*, for instance, the Supreme Court held that a defendant who had been released "on his own recognizance" and was thus "at large" was nonetheless "in custody" within

the meaning of § 2241. *See* 411 U.S. 345, 347, 351 (1973). In so holding, the Court acknowledged an extension of *Jones*: "It is true, of course, that the parolee is generally subject to greater restrictions on his liberty of movement than a person released on bail or his own recognizance." *Id.* at 348. But the Court rejected an understanding of the custody requirement that, in its words, would "suffocate the writ in stifling formalisms or hobble its effectiveness with the manacles of arcane and scholastic procedural requirements." *Id.* at 350. Rather, the Court said, the habeas remedy should be deployed with "initiative and flexibility." *Id.* (quoting *Harris v. Nelson*, 394 U.S. 286, 291 (1969)). The petitioner before it, the Court concluded, faced "restraints 'not shared by the public generally'"—and was thus in custody—because (1) he couldn't "come and go as he please[d]," (2) his "freedom of movement rest[ed] in the hands of state judicial officers, who [could] demand his presence at any time and without a moment's notice," and (3) "[d]isobedience [was] itself a criminal offense." *Id.* at 351.

Over the last half-century, this circuit has applied *Jones* many times—perhaps most recently in an opinion that I authored, *Romero v. Secretary, U.S. Dep't of Homeland Sec.*, 20 F.4th 1374 (11th Cir. 2021). The question there was whether an immigrant subject to pre-deportation supervision was "in custody" for habeas purposes. In concluding that she was, we held that her conditions of supervision were "similarly restrictive" to those that our predecessor court had deemed sufficient to constitute custody in *United States ex rel. Marcello v. District Director of INS*, 634 F.2d 964 (5th

Cir. 1981). In particular, we pointed to a collection of case-specific circumstances: The immigrant before us (1) had to "appear in person at the government's request," (2) couldn't "travel outside Florida for more than 48 hours without advance notice," (3) had to "apprise the government of any change in residence or employment," and (4) had to "participate in a more stringent supervision program if directed to do so." *Id.* at 1379 (internal quotations omitted). Because "those restraints [were] materially similar to the ones imposed on the petitioners in *Jones* and *Marcello*," we held, she was "in custody" within the meaning of § 2241. *Id.*

＊　＊　＊

Taking stock: *Jones* was a "revolution[]" indeed. Hart & Wechsler, *supra*, at 1354. In keeping with the writ's "body"-based origins, the British Parliament had designed habeas corpus to remedy actual, physical confinement, and Blackstone had clearly explained the writ that way. On this side of the Atlantic, the same men who theorized the "judicial Power" and created the federal courts memorialized the close-confinement understanding of "custody" in the Judiciary Act of 1789. Framing-era decisions reflected that settled view, and for almost two centuries, the Supreme Court itself respected it. *Jones* abandoned all of that, substituting in its place an atextual, ahistorical, know-it-when-you-see-it criterion: whether the petitioner is prevented from "do[ing] those things which in this country free men are entitled to do." 371 U.S. at 243.

### III

If it were up to me, I would scrap *Jones*'s freewheeling, ad hoc approach in favor of a return to the ordinary and original understanding of the term "custody." I say so for textual, historical, and practical reasons, which I will attempt to unpack in turn.

### A

First, the text. It is by now hornbook law that a court should "interpret[] a statute in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1738 (2020). The reasons, the Supreme Court has reminded us, are (1) that "only the words on the page constitute the law adopted by Congress and approved by the President," and (2) that if "judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives" and "deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations." *Id.*

There was no doubt—nor is there currently any dispute— about the ordinary public meaning of the term "custody" at the times of any of the federal habeas statutes' enactments. Custody meant then (as it means now) close physical confinement or detention—*i.e.*, "actual imprisonment." *See supra* at 2–4 (collecting historical definitions); *see also* Maj. Op. at 3 (collecting modern

definitions). Conspicuously, the Supreme Court in *Jones* made no effort to ground its flabby interpretation of "custody" in that term's plain meaning. Quite the contrary, the Court jettisoned what it called "formalistic" considerations in favor of what it took to be the writ's "grand purpose." 371 U.S. at 243.

Such a lax mode of statutory interpretation was wrong in 1963, and it is even more wrong—or more evidently wrong—today. The Supreme Court would do well to bring (or to restore, really) the same plain-meaning interpretive approach to the habeas statutes that it applies to other written laws.

### B

There's also the related matter of history. Although the *Jones* Court didn't spurn history to quite the extent that it disregarded statutory text, its historical analysis—as others have noted—leaves a lot to be desired. As Professor Oaks unmasked in his trenchant critique, "the Supreme Court's statement that its decision . . . was supported by the 'history of habeas corpus in both England and in this country' falls considerably sort of complete accuracy." Oaks, *Legal History*, *supra*, at 471 (quoting *Jones*, 371 U.S. at 238). In particular, he observed, the Court's sourcing was startingly selective—"a regal patchwork of history that, on close examination, proves as embarrassingly illusory as the Emperor's new clothes." *Id.* at 472. Most notable, perhaps, were what Oaks called "sins of omission." *Id.* at 468. In particular, the Court never grappled with early American decisions like *Respublica* and *Buyck*—and perhaps even more jarringly, never even cited its own

decisions in *Wales* and *Stallings*, even though both were indisputably relevant, and even though both had been examined in the parties' briefs and the lower courts' opinions.  Not good.

But there were sins of commission too.  Having ignored what would seem to have been the key precedents, the *Jones* Court substituted a motley collection of its own.  Again, Professor Oaks: "Although Mr. Justice Black," who authored the opinion, "'looked to common-law usages and the history of habeas corpus both in England and in this country,' he chose his precedents from" among arcane decisions "involving aliens seeking entrance to this country, and common-law decisions under which the writ was issued to liberate wives or minor children 'not under imprisonment, restraint or duress of any kind.'"  *Id.* at 470 (quoting *Jones*, 371 U.S. at 238–39).  But neither of those categories of cases is particularly probative.  Some of the domestic-relations cases are old, to be sure; they include several 18th- and 19th-century English decisions.  *See* 371 U.S. at 238–39.  But they uniformly involved the use of the writ to free individuals from *private* custodians, a situation that goes well "beyond the reach of any habeas statute ever enacted by Congress"—all of which, of course, pertain to those in *government* custody.  *Department of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1972 (2020); *see also* 28 U.S.C. § 2241, 2254, 2255.  From among *that* category, the *Jones* Court conspicuously ignored early English precedents that contradicted its conclusion.  *See, e.g.*, *Palmer v. Forsyth and Bell*, 107 E.R. 1108, 1109 (1825) (quashing the writ because the custodian "had no power at all over the body

of the defendants"); *Rex v. Dawes* and *Rex v. Kessel*, 97 E.R. 486, 486 (1758) (refusing habeas relief to conscripted soldiers who had either (1) absconded or (2) been made a corporal on the ground that "neither of them was in custody").

The *Jones* Court's reliance on immigration-related cases was similarly misplaced, for at least two reasons.  For one, those decisions aren't particularly historical—most of them, like *Jones* itself, dated from the mid-20th century.  *See, e.g.*, *Brownell v. We Shung*, 352 U.S. 180 (1956); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950).  For another, the *Jones* Court's major premise—that the aliens in those cases were "free to go anywhere else in the world," 371 U.S. at 239—is false.  The truth is that excludable immigrants were "locked up until carried out of the country against [their] will," *Chin Yow v. United States*, 208 U.S. 8, 13 (1908), and the fact that they could voluntarily depart for China, Italy, or Ireland is irrelevant.  Vis-à-vis *this* country—which is all that matters when one is seeking relief against this country's agents—the immigrants to whom the *Jones* Court pointed were most assuredly in "custody."  *See Mezei*, 345 U.S. at 220 (Jackson, J., dissenting) (noting that those individuals were "incarcerated by a combination of forces which ke[pt them] as effectually as a prison, the dominant

and proximate of these forces being the United States immigration authority").[1]

C

Lastly, the practical. Even setting aside *Jones*'s glaring textual and historical deficiencies, the rudderless things-that-free-men-can-do inquiry that it decreed has left courts at sea in making case-by-case "custody" determinations. In applying that hopelessly opaque standard, judges are consigned to a gestalt totality-of-the-circumstances analysis, wondering whether a particular jumble of conditions are together "enough to invoke the help of the Great Writ." *Jones*, 371 U.S. at 243.

The majority's analysis in this case—although scrupulously conscientious—perfectly illustrates the problem. To its great credit, the majority admits the difficulty of the task before us: "The

---

[1] The *Jones* Court's invocation of two mid-20th-century *district court* decisions involving military enlistees adds nothing to its historical analysis. *See* 371 U.S. at 240 & n.11 (citing *Ex parte Fabiani*, 105 F. Supp. 139 (E.D. Pa. 1952), and *United States ex rel. Steinberg v. Graham*, 57 F. Supp. 938 (E.D. Ark. 1944)). Even setting aside those decisions' recency, they were aberrant, and they were denounced at the time for having "not correctly state[d] the law." *Lynch v. Hershey*, 208 F.2d 523, 524 (D.C. Cir. 1953) (observing that "constructive custody" was an "untenable" basis for habeas relief); *see also, e.g.*, *McDowell v. Sacramento Loc. Bd. Grp., Boards 21, 22 & 23, Selective Serv. Sys.*, 264 F. Supp. 492, 495 (E.D. Cal. 1967) (same). *See generally Remedies Against the United States and Its Officials*, *supra*, at 865 & n.240 (explaining, "contra" *Fabiani*, that "[o]nly a person in actual custody is entitled to the writ of habeas corpus").

question," it says, "is whether the reporting and registration requirements" imposed by Florida's sex-offender statute "constitute a sufficient restraint on the personal liberty of sex offenders in Florida to render someone like Mr. Clements 'in custody.'" Maj. Op. 18–19. But, it continues, "Supreme Court and Eleventh Circuit cases"—by which it means *Jones* and its progeny, including *Hensley*, *Marcello*, *Romero*, etc.—"make this a hard question to answer." *Id.*; *accord, e.g., id.* at 3–4 ("[T]he question is difficult given Supreme Court and Eleventh Circuit precedent."). Having canvassed the relevant precedents—and the attendant smorgasbord of contextual considerations—the majority is left to articulate the Court's holding as follows: "After a quantitative and qualitative analysis, we conclude—admittedly with some hesitation—that as a whole Florida's registration and reporting requirements for sex offenders did not render Mr. Clements 'in custody' at the time he filed his habeas corpus petition." *Id.* at 22.

That is an admirably forthright statement and application of existing doctrine—and I think, under that doctrine, a correct decision. But the summary really says it all about the doctrine itself: We've explored all the relevant factors, along two vectors—both "quantitative" and "qualitative." We've considered those factors' interrelationship, "as a whole." And although we're "hesita[nt]" about our conclusion, we've determined, on balance, that Mr. Clements is indeed not "in custody." Again, A+ for candor and conscientiousness. But the underlying doctrine, in my estimation, is fundamentally broken.

The problem is that *Jones*'s things-that-free-men-can-do standard is so vague—and the considerations that courts must consult to operationalize it so multifarious—that many, if not most, cases can be decided either way.  Compare, for instance, the razor-thin distinctions that separate this case from *Marcello* and *Romero*, in which we held that the habeas petitioners *were* "in custody." Mr. Marcello was on "supervised parole, which require[d] him to report quarterly to the INS and notify it whenever he intend[ed] to leave [his home state] for more than 48 hours."  634 F.2d at 971 n.11.  Ms. Romero had to "appear in person at the government's request," give immigration authorities 48 hours' notice before traveling outside her home state, and "apprise the government of any change in residence or employment."  20 F.4th at 1379.  For his part, Mr. Clements has to (among other things) appear in person at his county sheriff's office twice a year, report to a drivers' license office every time he changes residences, give 21 days' notice before leaving the country, and give 48 hours' notice before establishing any temporary residence in another state.  While Marcello and Romero might have had it slightly worse, it's hard to say that the conditions they faced were categorically more onerous than Clements's.

Consider, as well, how just a tweak or two to Clements's own situation might affect his "custody" status.  What if he were trapped (so to speak) not in 65,000-square-mile Florida, but in 1200-square-mile Rhode Island?  Likelier in custody?  What if Clements had to notify officials seven days before leaving the state, rather

than just two—custody?  And how should we weigh routine in-person reporting requirements?  They impede one's freedom of movement, to be sure, but how much?  And are they more restrictive than an official's unfettered discretion to summon?  Or perhaps less so?  And might the answer to that question depend on the particular petitioner's risk tolerance?

You get the point:  Determining custody status under *Jones* and its progeny isn't—and will never be—remotely systematic or scientific.  It will always be fraught with the risk of error—and, far worse, with the risk of manipulation.  And that, to my mind, is no good.  *Cf. United States v. Jimenez-Shilon*, 34 F.4th 1042, 1054 (11th Cir. 2022) (Newsom, J., concurring) (lamenting "judge-empowering" multifactor balancing tests); *cf. also* Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1178–82 (1989) (criticizing "discretion-conferring" standards as inviting unfairness, unpredictability, and arbitrariness).

*   *   *

*Jones*'s freewheeling things-that-free-men-can-do standard bears no connection to the plain meaning of the term "custody," has no firm footing in the history of habeas corpus, and is infinitely manipulable in practice.  It's time, I think, for a course correction.

## IV

I'll conclude by echoing Justice Blackmun's penetrating critique of the Supreme Court's modern "custody" jurisprudence:  "[T]he Court has wandered a long way down the road in expanding

traditional notions of habeas corpus. . . .  Although recognizing that the custody requirement is designed to preserve the writ as a remedy for severe restraints on individual liberty, the Court seems now to equate custody with almost any restraint, however[] tenuous. One wonders where the end is." *Hensley*, 411 U.S. 353–54 (Blackmun, J., concurring).

The solution, it seems to me—as it so often does—is "a return to first principles." *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1263 (11th Cir. 2022) (Newsom, J., concurring).  Unless and until Congress itself expands the writ's scope—which, to be clear, would be fine by me—I would hold that an individual is "in custody" within the meaning of the federal habeas corpus statutes if, but only if, he is in close physical confinement. That understanding follows from the phrase's original and ordinary meaning, jells with courts' early (and longstanding) interpretations, and minimizes the risk that similarly situated individuals will be treated differently and that even well-meaning judges will find themselves "mak[ing] stuff up" as they go.  *Id.* at 1261.